Robyn **SANDERS** & Cynthia **Mullanix, Plaintiffs,**

v.

Shelby **BAUCUM, Defendant.**

**Civil Action No. 3:92–CV–1630–P.**

United States District Court, N.D. Texas, Dallas Division.

June 10, 1996.

---

Robert G. Chadwick, Jr., Dallas, Texas, Eric Eisenbraun, Ferrer, Montes, Poirot & Eisenbraun, Dallas, Texas, for Robyn Sanders and Cynthia Mullanix.

Ray Fargason, Harding, Bass, Fargason & Booth, L.L.P., Lubbock, Texas, for Shelby Baucum.

John E. McFall, Bryant McFall, John E. McFall & Associates, Dallas, Texas, for Casa View Baptist Church.

## MEMORANDUM OPINION and ORDER

SOLIS, District Judge.

Plaintiffs Robyn Sanders and Cynthia Mullanix, who were members and employees of Casa View Baptist Church ("the Church"), entered into secular counseling relationships with their minister, Shelby Baucum, who assured them that he was an experienced counselor equipped to assist them with their mar-

ital and emotional problems. During the course of the counseling sessions, the relationship between Baucum and each of the Plaintiffs became sexual in nature. Soon after learning of the situation, the Church asked Baucum to resign and terminated Plaintiffs from their respective positions. As a result of these events, Plaintiffs initiated a lawsuit against Baucum and the Church; their causes of action against Baucum included counseling malpractice, breach of fiduciary duty and intentional infliction of emotional distress, while they alleged that the Church was liable for discrimination in employment pursuant to Title VII, negligent hiring, negligent supervision and intentional infliction of emotional distress. Baucum also brought cross-claims against the Church for breach of contract and wrongful discharge.

Subsequently, over the course of nearly four years, this case wound its way through extensive discovery and various pre-trial motions. In August 1995, the Court issued an opinion awarding summary judgment in favor of the Church on all of Plaintiffs' claims, dismissing Baucum's cross-claims against the Church as barred by the First Amendment, but allowing Plaintiffs' claims against Baucum to proceed to trial. *Sanders v. Casa View Baptist Church,* 898 F.Supp. 1169 (N.D.Texas 1995).

The case eventually culminated with a jury trial in January 1996; after nine-days of testimony and nearly ten hours of deliberation, the jury returned a verdict in favor of the Plaintiffs on each of the two counts in the charge, professional malpractice and breach of fiduciary duty. In accordance with the verdict, the Court entered a Final Judgment directing that "each Plaintiff recover damages of $72,500.00 from Defendant Shelby Baucum," and that all court costs be assessed against Baucum; on March 27, 1996, the Court awarded Plaintiffs $20,023.09 in costs against him.

The parties have now filed four post-judgment motions which the Court must consider: (1) Shelby Baucum's Renewal of Motion for Judgment After Trial and Brief in Support, filed February 14, 1996; (2) Shelby Baucum's Motion for New Trial and Brief in Support, filed February 14, 1996; (3) Casa View Bap-

tist Church's Motion to Amend Final Judgment and Brief in Support, filed February 14, 1996; and (4) Amended Brief in Support of Plaintiffs' Motion to Conform Final Judgment to Jury Verdict or, Alternatively, for New Trial, filed February 14, 1996. The Court will consider each of these motions in turn.

## I

### Renewal of Motion for Judgment After Trial

The Federal Rules of Civil Procedure provide that:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable ruling on that issue.

FED.R.CIV.P. 50(a)(1). On January 23, 1996, at the close of all the evidence, Defendant moved for a judgment as a matter of law, arguing that the Free Exercise Clause of the First Amendment precluded a submission of any claim to the jury. After hearing oral arguments from both sides, the Court denied Defendant's Motion. Defendant now renews his motion for judgment as a matter of law pursuant to Rule 50(b), which provides:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of the judgment ... In ruling on a renewed motion, the court may:
>
> (1) if a verdict was returned:
>
> (A) allow the judgment to stand,
>
> (B) order a new trial, or
>
> (C) direct entry of judgment as a matter of law.

FED.R.CIV.P. 50(b). In ruling on a motion for judgment as a matter of law, the Court is guided by the test first enunciated in this Circuit by *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc), where the court stated that when considering a motion for judgment as a matter of law, a district court:

> [s]hould consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied
> . . .

*Id.* at 374–75. In other words, the Court must determine whether there is sufficient evidence to support the jury's verdict and in so doing, all evidentiary conflicts are to be resolved in favor of the successful party and that party is to be given the benefit of all reasonable inferences; fundamentally, the court must decide based on the evidence whether a reasonable jury could conclude as the jury did. *Turner v. Purina Mills, Inc.,* 989 F.2d 1419, 1421 (5th Cir.1993).

In moving for judgment as a matter of law, the crux of Defendant's objection is that the First Amendment to the United States Constitution prohibits judicial review of the counseling relationship as found by the jury, and forecloses any action for breach of fiduciary duty as found by the jury, because the evidence at trial allegedly demonstrated a mix of secular and religious counseling. Baucum also argues that the evidence does not support the submission of an interrogatory to the jury on the issue of counseling because it was not shown that Baucum's counseling was not part of the Church's religious beliefs and practices. For the reasons stated below, Baucum's most recent attempt to avail himself of the First Amendment's shield must fail.

## A. Free Exercise Jurisprudence

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof* . . ." U.S. CONST. Amend. I (emphasis added.) There is no debating that the Supreme Court has consistently recognized that the First Amendment has built a wall of separation between church and State; as the Fifth Circuit has observed, though the wall "between permissible and impermissible intrusion of the State into matters of religion may blur, or become indistinct, or vary, it does and must remain high and impregnable." *McClure v. Salvation Army,* 460 F.2d 553, 558 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). A spirit of freedom for religious organizations, including the power to decide for themselves matters of church government as well as those of faith and doctrine, is consistently reflected in the Supreme Court's decisions. *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

Consistent with this philosophy, the Fifth Circuit has, on numerous occasions, declined to exercise jurisdiction over ecclesiastical matters which extend to the core of religious beliefs. For example, in *McClure,* 460 F.2d at 558, the court was presented with the question of whether Title VII applied to the employment relationship between a church and its ministers, and if applicable, whether the statute impinged upon the Religion Clauses of the First Amendment. The Fifth Circuit concluded that although Congress did not intend that religious organizations be exempt from Title VII liability, the application of Title VII would violate the Religion Clauses. *Id.* at 558. The court reasoned that to apply the strictures of the civil rights laws would infringe on decisions—such as a minister's assignment, his salary or his duties—which are "matters of church administration and government and thus, purely of ecclesiastical cognizance." *Id.* at 560. In essence, the court was concerned with preserving the religious freedom of churches

and precluding civil court review of religious practices and decisions.

In *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir.1974), the court echoed this concern; in *Simpson*, the plaintiff was a pastor who brought a civil rights suit for damages resulting from his ouster by church officials. The court wasted no time in determining that it lacked jurisdiction to hear the pastor's case, because it presented a purely ecclesiastical dispute involving "a congregation's determination as to who shall preach from the church pulpit [which] is at the very heart of the free exercise of religion." *Id.* at 492. Again, the court was careful to avoid trampling on doctrinal beliefs and meddling with internal decisions of a religious society.

■ It is clear, then, that the Free Exercise Clause, upon which Baucum's defense is based, seeks to protect religious beliefs and religious conduct; it does not, however, purport to extend to secular beliefs and activities. In *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972), the Supreme Court explained that "a way of life, however virtuous and admirable, may not be interposed as a barrier to a reasonable state regulation ... if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief." Nearly ten years later, the Court enforced this notion in *Thomas v. Review Board of Indiana Employment Security Div.*, 450 U.S. 707, 713, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) ("Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion.") (citing *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Yoder*, 406 U.S. at 215–16, 92 S.Ct. at 1533–34).

■ The Free Exercise Clause also does not relieve an individual of the obligation to comply with neutral laws of general applicability. *Employment Div. Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872,

110 S.Ct. 1595, 108 L.Ed.2d 876 (1990);[1] the Supreme Court has found that since such laws do not specifically endeavor to regulate religious conduct, they can be enforced even to proscribe (or prescribe) conduct which one's religion prescribes (or proscribes) without offending the First Amendment. *See Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *Smith*, 494 U.S. 872, 110 S.Ct. 1595. Similarly, the Court has held that since such laws do not have as their specific object the regulation of religious beliefs as such, they can be applied to resolve even internal disputes within a church without offending the First Amendment. *See Jones v. Wolf*, 443 U.S. 595, 602–04, 99 S.Ct. 3020, 3024–26, 61 L.Ed.2d 775 (1979) (holding that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (holding if intra-church property dispute required interpreting and weighing church doctrine, a court cannot intervene; if, however, neutral principles of law could be applied without determining underlying questions of religious doctrine and practice, a court could intervene).

■ Because religious organizations do not enjoy absolute immunity from tort liability, it is not unprecedented to subject members of the clergy to liability for negligence, including standards of professional care and fiduciary duties. The cases demonstrate that if a clergyperson holds himself out as having the skill and experience of a secular professional and undertakes to provide a secular service, he can be held to the same secular standard of care by which secular professionals are held under similar circumstances. *Moses v. Diocese of Colo.*, 863 P.2d 310, 320–21 (Colo.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994) (holding that actions against clergy members and

---

1. In *Smith*, the Court noted that "the only decisions in which [it has] held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press." *Id.* at 881, 110 S.Ct. at 1601 (citations omitted).

their superiors that involve claims of breach of fiduciary duty ... are actionable); *Doe v. Samaritan Counseling Center,* 791 P.2d 344 (Alaska 1990) (clinic could be liable under respondeat superior for mishandling of transference by pastoral counselor); *Zakhartchenko v. Weinberger,* 159 Misc.2d 411, 605 N.Y.S.2d 205, 206 (Sup.1993) (rabbi who performs circumcisions as part of a Jewish ritual must meet standards of skill and care prevailing among secular professionals who perform circumcisions); *Adams v. Moore,* 96 N.C.App. 359, 385 S.E.2d 799, 801 (1989), *rev. denied,* 326 N.C. 46, 389 S.E.2d 83 (1990) (preacher owed a fiduciary duty to a parishioner and violated that duty by using his position and influence to obtain the deed to the parishioner's home and then selling it for a quick profit); *Erickson v. Christenson,* 99 Or.App. 104, 781 P.2d 383, 386 (1989) (holding a priest who abuses his role as counselor can be liable for breach of fiduciary duty).

It is because of these inherent limitations to the application of the Free Exercise Clause that the Court faces the legal question presently before it. Not surprisingly, only a handful of courts has published opinions addressing the specific issue presented in the case at hand. For example, in *Dausch v. Rykse,* 52 F.3d 1425 (7th Cir.1994), the Seventh Circuit reviewed a district court's dismissal of an individual's complaint which alleged, among other things, professional malpractice and breach of fiduciary duty against her minister. The plaintiff, Dausch, claimed that she sought counseling from Reverend Rykse, who allegedly "engaged in dangerous and improper counseling relations" with her, which included "engaging in sexual contact during the course of psychotherapy." *Id.* at 1427. The district court had dismissed the complaint as essentially stating a claim for clergy malpractice. In assessing her complaint the circuit court concluded that she had in fact stated a valid claim for professional malpractice.[2] The *Dausch* court reaffirmed that a claim for clergy malpractice has been uniformly rejected by the states which have considered it, but observed that

> This judicial refusal to examine the pastoral activity of members of the clergy, when such a judicial inquiry would require examination and evaluation of the clergy's adherence to the tenets of his or her faith or of internal decisions and organization of the church, has not been extended to situations in which the conduct in question does not bear such a direct relationship to the doctrinal or organizational aspects of religious practices.

*Id.* at 1432. Despite the nonrecognition of clergy malpractice in Illinois, the court noted that the state's law recognizes a cause of action for counseling (psychotherapy) malpractice, because it "does not implicate judicial assessment of the tenets of a particular religion or a determination of whether a particular litigant has adhered to those tenets. Rather, the sole inquiry is whether the individual has engaged in conduct that the state has deemed harmful." *Id.* at 1433. The court stated that when a plaintiff alleges that the counseling was secular in nature, or that the provider held himself out to be providing the service of a psychological counselor, the negligence claim cannot be characterized as one for clergy malpractice. "Tort claims for behavior by a cleric that does not require the examination of religious doctrine," the court concluded, "are cognizable." *Id.*

The Supreme Court of Colorado has also considered this issue and found that clergymembers are not completely insulated from liability by the First Amendment's Free Exercise Clause for conduct which arises in the context of a counseling relationship. *Destefano v. Grabrian,* 763 P.2d 275 (Colo.1988).[3]

---

2. The Court rejected Plaintiff's claim for breach of fiduciary duty because it was alleged to have occurred in the context of a pastor-parishioner relationship, and would have "required the court to define the scope of a fiduciary duty owed persons by their clergy, a matter clearly rooted in the tenets and internal organization of a religion." *Id.* at 1438.

3. In *Destefano,* the court allowed the plaintiff to proceed with a claim for breach of fiduciary duty against the priest, but not for professional malpractice. It appears that the *Destefano* court's decision to dismiss the professional malpractice claim was based specifically on Colorado law, which expressly evinces an intent to exclude religious ministers, priests and rabbis from the statutory scheme which imposes liability upon mental health professionals for malprac-

The court declared that "members of the clergy cannot, in all circumstances, use the shield of the First Amendment as protection and as a basis for immunity from civil suit." *Id.* at 284 (citations omitted). Citing *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the court stated that a party challenging governmental action as an infringement of his free exercise rights must show that there is a coercive effect against his practice of religion. *Id.* at 283. The threshold question, then, is whether the conduct of the defendant is religious; the *Destefano* court found that the Grabrian's conduct was not. The court noted that

> if the alleged conduct of Grabrian was dictated by his sincerely held religious beliefs or was consistent with the practice of his religion, we would have to resolve a difficult first amendment issue. This, however, is not the case. It has not been asserted that Grabrian's conduct falls within the practices and beliefs of the Catholic church ... As such, the conduct upon which [plaintiff's claim] is premised is, by definition, not an expression of a sincerely held religious belief.

*Id.* at 284.

### B. The Jury's Verdict

▪ In this case, the Plaintiffs' claims, and more importantly the jury's verdict, are squarely in line with Supreme Court Free Exercise jurisprudence, Fifth Circuit precedent, and the several courts who have expressed an opinion on this issue. First, the charge itself made it clear that the jury could not base liability on clergy malpractice or on religious counseling. The charge explicitly stated that courts do not recognize a cause of action for clergy malpractice, and that as a result, Plaintiffs' first cause of action only encompassed malpractice in secular counseling and did not apply to religious or spiritual counseling. (Court's Charge to the Jury at 9). After having been informed of these

boundaries, and the prohibition against the clergy malpractice cause of action, the jury was specifically asked "if you find that a counseling relationship existed, do you find that such counseling relationship was essentially *secular marital or mental health counseling in nature?*" (Court's Charge to the Jury at 14) (emphasis added). If the jury had answered "no" to this question, they were instructed to proceed to the certificate page of the charge, and find no liability. The jury, however, found that the counseling was secular; this conclusion is consistent with the evidence presented at trial. The testimony painted a clear picture of secular counseling, and Baucum's attempt to characterize it otherwise did not persuade the jury, and it does not sway the Court now.

Robyn Sanders testified that her counseling sessions began in March of 1990 and ended in September of 1991; she also testified that the sessions would occur at least once a week. Over the course of these nineteen months, Sanders had at least 150 sessions with Baucum. Sanders also testified concerning the topics which were covered during these counseling sessions; she and Baucum discussed matters ranging from her marital, financial, emotional and sexual problems to her concerns about her career, her children, and her academic pursuits. She explained that Baucum gave her advice and offered his opinions as to each of these areas, suggesting ways to improve her self-esteem, how to sustain her marriage, or how to best cope with her financial troubles.

There was no evidence at trial that Baucum quoted Bible passages or made reference to religious materials during these sessions. She testified that they never prayed together, and that she did not remember Baucum quoting scripture; in short, they did not broach religious topics. Although the Defense points out that Sanders testified on cross-examination that Baucum provided her with pastoral counseling, she later explained

---

tice. Therefore, the court reasoned, plaintiff's claim could be nothing but one for clergy malpractice. *Id.* at 286.

In this case, at the time Plaintiffs filed their lawsuit, there was no applicable state statute. Since that time, the Texas legislature has enacted

a law which covers liability for sexual exploitation in counseling in a professional relationship, including a clergy member's assistance to an individual resolving emotional, attitudinal, or relationship conflicts. *See* TEX CIV.PRAC. & REM.CODE § 81.001 *et seq.*

her own definition of pastoral counseling as simply "when a pastor counsels." She also stated that Baucum did not provide her with spiritual, or religious, counseling. She revealed that she had received spiritual counseling in the past from Sunday School teachers and from other ministers, but at several different points in her testimony she stressed that she did not receive such counseling from Baucum. Thus, there was ample, detailed testimony at trial from which the jury could find that the counseling relationship was secular in nature.

With respect to Cynthia Mullanix, much the same evidence was presented. Her marital counseling relationship with Baucum occurred during the period between November 1990 and September 1991; they met regularly during these eleven months, sometimes several times a week. She testified that during these sessions, they discussed a broad range of topics, including her marriage to her current husband, incidents of childhood sexual abuse, financial problems, work, and her children. She also stated that Baucum gave her advice and opinions, all of which could be expected from a secular, mental health counselor: assistance with her self-esteem, recommendations about how to preserve her marriage, and reminders about the importance of continuing with counseling.

She also testified that *prior to* the secular counseling sessions, she had approached Baucum on religious matters because she was a member of Church-related groups, such as the Women's Missionary Union, Girls Union and an adult Sunday School class; these discussions with Baucum she characterized as involving religious or spiritual counseling. Mullanix explained, however, that when she later began to meet with Baucum for secular counseling, he did not mention the Bible or make religious references in the context of the marriage counseling.[4] Thus, there was substantial evidence that during the relevant time period, between November 1990 and September 1991, the

counseling relationship was secular in nature; as with Sanders, this was a reasonable conclusion for the jury to reach, given the evidence.

Second, the causes of action, the jury charge and the verdict are in line with Supreme Court and Fifth Circuit law which cautions against civil courts making determinations on questions of religion. As the court recognized in *Schmidt v. Bishop*, 779 F.Supp. 321, 327 (S.D.N.Y.1991), "tort claims for behavior by a cleric that does not require the examination of religious doctrine are cognizable." In this case, the jury was not asked any questions which touched on spirituality or religious matters, thereby entangling the civil court with interpretation or analysis of religious doctrine. *See Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The jury was not asked to judge the propriety of any religious matters; the members of the jury were not asked to pass on whether Baucum referred the Plaintiffs to wrong or misleading Bible passages, or whether he doled out adequate and helpful religious advice. They were not asked to decide whether he provided them with sound spiritual guidance. The complaint as construed by the Court, the testimony at trial, and the jury charge suggested no such claims.

Instead, the jury's assessment followed a neutral-principles approach that was completely secular in operation; the jury was asked to evaluate the actions of Baucum independent of any religious considerations. Unlike *Simpson* or *McClure*, where the court concluded that the plaintiffs' claims would necessarily involve determination of religious issues, the claims in this case were resolved on the basis of neutral principles of law which were applied without establishing any particular view or interpretation of religious doctrine. *Simpson*, 494 F.2d at 493; *McClure*, 460 F.2d at 560. The jury was asked to determine issues that were quite

4. On January 12, 1996, during re-direct examination, Mullanix gave the following testimony:
Q: Did [Baucum] ever, at any time ... throughout the entire time of your counseling relationship, reference scripture in relationship to your marriage to [your husband]?
A: No.
Q: With respect to your relationship to your children?
A: No.
Q: With respect to your childhood abuse?
A: No.

apart from religion or religious beliefs. The charge asked them to determine whether Baucum was liable for counseling malpractice and whether he breached fiduciary duties owed to the Plaintiffs as a result of the secular counseling relationships, both of which are questions which turn on neutral principles of tort law. The jury concluded that Baucum had presented himself as a competent marriage counselor, had initiated a secular counseling relationship with Plaintiffs, was negligent in performing such counseling, and thereby caused harm to the Plaintiffs; thus, Baucum was held to the standards required by the civil law of all who undertake the sensitive task of counseling. The causes of action, the charge and the jury's verdict, therefore, do not run afoul of the Free Exercise Clause.

Finally, as the court noted in its summary judgment, "if Plaintiffs' allegations are true, Baucum's preying on [women], masqueraded in the form of marriage counseling, constitutes conduct that is not subject to First Amendment protection. Certainly such conduct is not part of the beliefs and practices of Casa View." *Sanders*, 898 F.Supp. at 1174. In the end, the evidence at trial supported these allegations. As the court observed in *Destefano*, "the free exercise clause is relevant only if the defendant can show that the conduct that allegedly caused plaintiff's distress was in fact part of the belief and practices of the religious group." 763 P.2d at 283. The actions of Baucum can hardly be considered part of the Baptist faith; in this case, the evidence was clear that Baucum's conduct, of which Plaintiffs complain, was not religious and does not entitle him to a Free Exercise defense.

In light of the evidence presented at trial, there can be no question as to the propriety of the jury's verdict, and the conclusion that the counseling relationship was of a secular nature; given the testimony at trial, and weighing the credibility of the witnesses, it is clear that the jury reached a reasonable conclusion concerning the nature of the counseling, and rendered its verdict based on the secular counseling relationship and not on religious considerations. Clearly, the test enunciated in *Boeing* is met, and the Court

must therefore DENY Defendant's Renewed Motion for Judgment as a Matter of Law.

## II

### Motion for New Trial

■■■ The Federal Rules provide that "a new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have been granted in actions at law in the courts of the United States." FED.R.CIV.P. 59(a). Generally, the determination as to whether a new trial should be granted is within the sound discretion of the trial court. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (explaining application of rule); *Weaver v. Amoco Prod. Co.*, 66 F.3d 85 (5th Cir.1995) (district court's ruling on motion for new trial is reviewed only for abuse of discretion, and district court is given greater deference when motion is denied, leaving the jury's determinations undisturbed).

### A. General Objections

Pursuant to this Rule, Baucum moves for a new trial on numerous grounds. First, in brief and unsupported assertions, Defendant claims that he is entitled to a new trial on the grounds that (i) the verdict is contrary to the law; (ii) the verdict is contrary to the evidence; (iii) the evidence is totally insufficient to show any liability on the part of the Defendant, and there is no evidence to sustain the verdict of the jury; and (iv) the evidence as considered in its most favorable light on behalf of the Plaintiffs is insufficient to support any verdict that might be rendered for the Plaintiffs against Defendant. (Def.'s Mot. for New Trial at 1) This is the extent of Baucum's argument; he completely fails to provide the Court with supportive reasoning or with references to the record which would justify these claims. In other words, he has suggested nothing which undermines the merit of the jury's verdict. The Court has thoroughly reviewed the transcripts of the trial and finds that there was ample evidence presented at trial which could have led the jury to find Baucum liable on the charges of professional malpractice and breach of fidu-

ciary duty, and the verdict is surely not against the great weight of the evidence. *Eyre v. McDonough Power Equip., Inc.*, 755 F.2d 416 (5th Cir.1985) (deference is accorded trial judge's firsthand opportunity to view witnesses and their demeanor, and to determine whether to grant motion for new trial if verdict is against the great weight of the evidence.) Thus, the Court finds no merit to these objections.

### B. Verdict was Excessive

 Defendant also claims that the verdict of the jury was excessive and appears to have been rendered under the influence of passion and prejudice. It is well established, however, that a strong presumption exists in favor of affirming a jury award of damages, and a verdict will be overturned only upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir.1995) (quoting *Westbrook v. Gen. Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir.1985)). This Circuit's case law provides that a verdict is excessive only if it is "contrary to right reason" or "entirely disproportionate to the injury sustained." *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983). Likewise, Texas law allows a punitive damage award to be overturned only when it is so excessive as to be manifestly unjust. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex.1994). In judging the reasonableness of an award of punitive damages, the Texas Supreme Court instructs the court to consider (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which the defendant's conduct offends the public sense of justice and propriety. *Alamo Nat'l Bank of San Antonio v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981).

 Against this legal backdrop, the Court concludes that the jury's verdict in this case was not excessive, and there is no evidence to suggest that the verdict is the result of the jury's passion rather than its reasons.

Plaintiffs' Second Amended Complaint requested $1 million in compensatory damages and $4 million in punitive damages for each Plaintiff. In counsel's closing argument for Plaintiffs, he estimated the expenses that each Plaintiff had accumulated in psychological and medical care, and then entreated the jury to use the monetary damage award to send a strong message to Shelby Baucum and other counselors, that it is "unacceptable to cross the line and destroy people's lives." In the end, the jury awarded each Plaintiff $30,000.00 in compensatory damages and $85,000.00 in punitive damages; needless to say, this was but a small portion of what they had requested, or perhaps even expected.

The Court also finds that the punitive damage award is reasonably proportioned to the actual damages; the ratio of punitive damages to actual damages in this case is less than 3:1, which is well within the bounds of reasonableness. *Brown v. Petrolite Corp.*, 965 F.2d 38, 49 (5th Cir.1992) (upholding a 12:1 ratio of punitive damages to actual damages); *Glassock v. Armstrong Cork Co.*, 946 F.2d 1085, 1096 (5th Cir.1991) (upholding 20:1 ratio of punitive damages to actual damages), *cert. denied sub nom., Celotex Corp. v. Glasscock*, 503 U.S. 1011, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992).

Evaluating each portion of the jury's award, the Court is convinced that the jurors weighed the evidence fairly, found Defendant liable, and awarded damages accordingly. The amount of money awarded by the jury was obviously not excessive or unreasonable given the circumstances of this case, the nature of Baucum's conduct, and the effect which his actions had upon the Plaintiffs. Defendant's Motion for New Trial on this ground is denied.

### C. Objections to Testimony

██ Defendant suggests that reversible error was committed when Plaintiff Robyn Sanders, in alleged violation of a motion *in limine*, made reference to other women who may potentially have been involved with Baucum,[5] and when Dr. Valerie Sheehan began

---

5. Specifically, on January 9, 1996, while on direct examination, Sanders testified:

*I thought about how [Baucum] had approached me about counseling. All the de-*

to make a similar comment during her testimony.[6] At the trial, the Court denied Baucum's motion for a mistrial, presenting several reasons why these vague and ambiguous references did not warrant a new trial. For example, the Court stated that Sanders' remark did not rise to the level of a mistrial, given that there was already testimony that Baucum had been counseling other women at the Church. The Court also explained that Sanders' testimony was not a clear violation of the language of the motion *in limine*, considering that she was not testifying as to a specific claim anyone had made against Baucum, but was only relaying her own observations of his interactions with other women in the Church. Similarly, when the defense moved for a mistrial after Dr. Sheehan's testimony, the Court again denied the motion as inappropriate, in large part because the question of Baucum having engaged in other affairs was still an open issue; the Court observed that evidence about Baucum having sexual affairs with other women was likely to come in at some point in the trial.[7]

Thus, at the time of trial, the Court did not consider these to be appropriate grounds for a new trial. In renewing his objection, Defendant has failed to meet his burden of demonstrating that this testimony warrants a new trial; he simply contends that these instances "caused unfair prejudice, confusion of the issues, and mislead the jury," without offering any evidence or proof of such an effect. Therefore, this objection is overruled.

■ Defendant also alleges that the Court erred in permitting Jana Martin to testify as a rebuttal witness concerning her sexual relationship with Baucum. The Court went to considerable effort at the time of trial to articulate why Ms. Martin's testimony was relevant and admissible under FED. R.EVID. 404(b) and 415. During a bench conference on January 24, 1996, the Court articulated its reasons as follows:

> The reason I think it is admissible, and we discussed this yesterday, I think it is a 404, and you do get the balancing, but the testimony, as I understood up to now, is Mr. Baucum is denying there was any kind of counseling relationship, any kind of a sexual relationship, and that one of the reasons he wouldn't have had the sexual relationship was because he was impotent, and second, because he's been faithful to his wife for however long they've been married, 30–something years, and he's a minister, and I think that goes to all of that.

> It goes to the issue of whether or not there was sexual conduct with the Plaintiffs. I think it's probative on that issue. It's probative on the issue of the fact he says he couldn't have had [sexual intercourse] because he was impotent, because they overlap, and this lady has testimony through her affidavit that, in fact, he wasn't impotent. And then that he says he wouldn't have done it because he's been faithful to his wife, and this goes directly to that issue as well.

> And I do think, based on the affidavit that I have, that there are similarities ... You can explore that certainly, but I think all those issues go to the weight, as far as my consideration in deciding admissibility. They are similar in the sense he is approaching women that he knows are in some type of distress, are in an emotional state, whether it was marital problems or

---

scriptions [Cynthia Mullanix] gave me about how their relationship had become sexual, and it related to mine, and I started thinking about all the women I saw going in and out of his office every day, the women he told me he was counseling, the things that he told me from those counseling session, and I felt like we were not the only victims.

**6.** On January 16, 1996, Dr. Sheehan, one of Robyn Sanders' psychiatrists, was testifying as to some of what Sanders told her about the sexual relationship with Baucum, and testified:

She went into some detail. I asked some questions; how did it come about, how long had this been going on, and what was the most recent problem with it. And she told me that it had been going on about a year, maybe a little more, and that he was also having an affair with her best friend, [Cynthia Mullanix]. This was very shocking to her. She was devastated with this knowledge. Then she discovered he's been having affairs with other—

**7.** In the end, another woman did testify during Plaintiffs' rebuttal case as to her sexual relationship with Baucum.

this Ms. Martin who had a broken engagement, and so he's aware of those situations, and he's approaching them, and it turns into a sexual relationship. That's apart from whether there was any counseling or not; obviously, there are so many issues here, but I think it's similar enough and [given] those other issues that I mentioned I think it's admissible. I'm going to let it in.

For all of the reasons stated above, the Court finds that the testimony of Jana Martin was clearly admissible under the Rules of Evidence and does not provide Defendant grounds for a new trial.

Defendant also complains of the prejudice that occurred when counsel for Plaintiffs inadvertently mentioned the word "insurance" allegedly within the hearing of the jury.[8] There is no evidence in the record that any member of the jury heard Mr. Eisenbraun's instruction to the witness. In fact, the Court, as well as Plaintiffs' other counsel, stated on the record that they did not hear the comment. Additionally, given the reasonable amount of damages awarded by the jury, it is not likely that their verdict was affected in any way by this occurrence. Finally, Plaintiffs' counsel points out that "even when the jury was asked during post-verdict interviews by Baucum's counsel whether anyone heard the word 'insurance' during such testimony, the answer was no." (Pls.' Br. in Opp. to New Trial at 2). Thus, the Court finds no reason for awarding a new trial on this ground.

### D. Objections to Jury Charge

Defendant also lodges numerous objections to the jury charge. First, he takes issue with the instructions and questions regarding professional malpractice on the ground that there are no pleadings to support these instructions. This objection has previously been addressed by the Court; in its earlier summary judgment opinion, the Court explicitly stated that although Plaintiffs' Complaint labeled their claim as one for "negligence (malpractice in Baucum's pastoral counsel-

ing)," the Court would construe the claim based on the facts alleged as one for professional malpractice by a marriage counselor. *Sanders*, 898 F.Supp. at 1175, *citing* FED. R.CIV.P. 8(f). *See also Schiavone v. Fortune*, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986) (quoting Rule 8(f) and emphasizing that the "principal function of procedural rules should be to serve as useful guides to help, not hinder, persons who have a legal right to bring their problems before the courts"); *Farina v. Mission Inv. Trust*, 615 F.2d 1068 (5th Cir.1980) (citing Rule 8 for the proposition that the federal pleading rules are not excessively technical). Given the Court's previous ruling on this issue, it is clear that there is no merit to this objection to the charge.

Next, Defendant objects to the breach of fiduciary duty claim on the basis that it is "clearly grounded in an alleged clergy/pastoral counseling relationship for which there is no cognizable cause of action." As the Court explained in its earlier summary judgment opinion, however, the nature of the marriage counseling relationship between Baucum and Plaintiffs was an issue of fact to be determined at trial. *Sanders*, 898 F.Supp. at 1176; *Destefano*, 763 P.2d at 283. In this case, after three weeks of testimony from numerous witnesses, the jury ultimately found that a counseling relationship existed between the parties, that it was secular in nature, that this relationship gave rise to a fiduciary relationship, and that Baucum breached his fiduciary duties to Plaintiffs.

Moreover, the jury charge makes it clear that the basis for the fiduciary relationship could not be a pastoral counseling relationship; the charge outlines the cause of action for breach of fiduciary duty, stating that the jury must consider whether Defendant "is liable for breaching fiduciary duties owed to the Plaintiffs in providing secular marital or mental health counseling." (Court's Charge to the Jury at 16). In addition, the jury was instructed that "a fiduciary relationship cannot arise solely out of a minister-parishioner relationship." (Id.) Finally, the charge enu-

---

8. On January 16, 1996, during a side-bar, Mr. Eisenbraun was instructing one of the Plaintiffs' witnesses that during her testimony she was not to mention anything about insurance or the existence of a insurance policy.

merated the elements of the cause of action, stating that the jury first must find, by a preponderance of the evidence, that a fiduciary relationship existed between Defendant and each Plaintiff which arose from a counseling relationship which was secular in nature. (Id. at 18) Thus, the charge made it clear that the jury was to base any finding of liability on the existence of a secular counseling relationship, not a pastoral counseling relationship; absent evidence to the contrary, the Court must presume that the jury properly followed its instructions. *McMullin v. Palmer*, 40 F.R.D. 368 (N.D.Miss.1966). Defendant's objection is overruled.

Next, with respect to the professional malpractice and breach of fiduciary duty claims, Defendant alleges that (i) there is no adequate definition of the reasonable duty standard against which Defendant's alleged conduct could be measured or evaluated, (ii) these claims represent the impermissible submission of a clergy malpractice claim, (iv) the claims are an impermissible attempt to recover damages for seduction and/or alienation of affection in violation of Texas law and failure to instruct the jury not to consider damages for alienation of affection and/or seduction constitutes reversible error.

■ An analysis of the charge reveals that it does contain adequate definitions of the standard of care. For example, the professional malpractice section of the charge contained a separate section which specifically defined the standard of care applicable to this cause of action. (Court's Charge to the Jury at 10). The instruction explained what would constitute negligence under this standard, and provided the jury with a proper and adequate basis upon which to judge the Defendant's conduct. Similarly, for the breach of fiduciary duty claim, the charge included a section detailing the cause of action, explaining the duties owed by Defendant, and the necessary elements of the cause of action. (Id. at 16–18). There is absolutely no evidence that the jury was confused or mislead as to the standard of care to be applied; thus, Defendant's objection on this ground is overruled.

The Court has already ruled on Defendant's contention that Plaintiffs' claims were essentially clergy malpractice claims; when the parties moved for summary judgment nearly two years ago, Defendant offered the same argument, which the Court rejected. At the time, the Court allowed the claims for professional malpractice and breach of fiduciary duty to proceed to trial, because courts recognize causes of action for counseling malpractice and breach of fiduciary duty. *Sanders*, 898 F.Supp. at 1174–76; *See Federal Savings and Loan Ins. Corp. v. Texas Real Estate Counselors*, 955 F.2d 261 (5th Cir. 1992); *St. John v. Pope*, 901 S.W.2d 420 (Tex.1995); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591 (Tex.1992). They are separate and distinct causes of action which provide Plaintiffs with cognizable legal claims against Baucum. Further, as the Court explained in greater detail in the previous section regarding Defendant's Motion for Judgment After Trial, Plaintiffs' claims are not claims for clergy malpractice, but are distinct causes of action for negligence in secular counseling and breach of fiduciary duties. Thus, the Court finds no merit to this objection to the charge.

■ Defendant's final objection that Plaintiffs' claims are merely an attempt to recover damages for seduction and/or alienation of affections, is also meritless. As an initial matter, the Court notes that it is well aware that these causes of action no longer exist under Texas law. *Scoggan v. Texas*, 799 S.W.2d 679 (Tex.Crim.App.1990) (penal offense of seduction ceased to exist in Texas as of January 1, 1974); *Truitt v. Carnley*, 836 S.W.2d 786 (Tex.App.—Ft. Worth 1992, writ denied); TEX.FAM.CODE ANN. § 4.06 ("a right of action by one spouse against a third party for alienation of affection is not authorized in this state"). A careful analysis of these causes of action, however, makes it abundantly clear that Plaintiffs' claims are not merely claims for seduction or alienation of affections. The section of the 1911 Texas Penal Code pertaining to seduction provided that "if any person, by promise to marry, shall seduce an unmarried female under the age of twenty-five years, and shall have carnal knowledge of such female, he shall be punished." *Holladay v. Texas*, 709 S.W.2d 194, 205 n. 3 (Tex.Crim.App.1986). Prior to

its abolition, the gist of the alienation of affection action was:

> the intentional or purposeful alienation of the affections of one spouse from the other; the damage, if any, in such a case is for loss of consortium; to establish a cause of action it is not necessary that there be a loss of all elements included in that term, but that any substantial impairment thereof, through unjustified intentional conduct, creates a cause of action in favor of the spouse damaged against the offender in this respect.

*Stites v. Gillum,* 872 S.W.2d 786, 790 (Tex. Ct.App.—Fort Worth) (quoting *Williams v. Rearick,* 218 S.W.2d 225, 229 (Tex.Civ.App.—Amarillo 1949, no writ)). It is clear, given the elements of these so-called heart-balm claims, that the Plaintiffs' claims are not attempts to recover damages for abolished causes of action. The Plaintiffs' Complaint does not include allegations to support these causes of action and the evidence presented at trial obviously did not suggest a claim for seduction or alienation of affections; rather, the essence of the Plaintiffs' claims is Baucum's departure from proper standards of counseling practice. *See Destefano,* 763 P.2d at 280. Therefore, the jury was specifically instructed on professional malpractice and breach of fiduciary duty, both of which were supported by the evidence presented at trial which established that Baucum purported to be an experienced marital counselor, entered into a secular counseling relationship with Plaintiffs, and breached standards of care as a counselor and fiduciary. (Court's Charge to the Jury at 9–12; 16–18).

Finally, Defendant maintains that the Court erred in refusing to instruct and submit to the jury the defensive issue of waiver as requested by Defendant for reason that sufficient evidence supported the same. Baucum does not, however, cite any authority regarding the issue of waiver nor does he articulate how the Court's refusal to instruct the jury regarding waiver affected the outcome of the case. In the absence of such a showing, no new trial is warranted.

Defendant having failed to raise any objections which would entitle him to a new trial, the Court finds that his Motion for New Trial should be DENIED in its entirety.

### III

#### Motion to Conform Final Judgment to Jury Verdict

 As previously mentioned, on January 25, 1996, the jury entered a verdict in favor of each Plaintiff on their tort claims of professional malpractice and breach of fiduciary duty; the jury also found that Baucum was grossly negligent as to each claim.[9]

Concerned about the possibility of double recovery, in its Final Judgment the Court directed that each Plaintiff recover $72,500.00 from Baucum, which represented the $30,000.00 compensatory damage award and $42,500.00 in punitive damages. Having revisited the issue and considered the punitive damages more thoroughly, the Court finds that each Plaintiff is entitled to recover $85,000.00 in punitive damages.

First, the conduct which the awards purportedly sought to punish and deter was different. The professional malpractice claim was based upon Baucum's breach of professional standards of conduct applicable to secular marital or mental health counsel-

---

9. The amount of money awarded by the jury was allocated as follows:

| Damages | Robyn Sanders | Cynthia Mullanix |
|---|---|---|
| Past Mental & Emotional Anguish | $ 20,000.00 | $ 20,000.00 |
| Future Mental & Emotional Anguish | $ 5,000.00 | $ 5,000.00 |
| Past Expenses for Psychiatric Care | $ 2,500.00 | $ 2,500.00 |
| Future Expenses for Psychiatric Care | $ 2,500.00 | $ 2,500.00 |
| Punitive Damages (Malpractice) | $ 42,500.00 | $ 42,500.00 |
| Punitive Damages (Fiduciary Duty) | $ 42,500.00 | $ 42,500.00 |
| TOTAL: | $115,000.00 | $115,000.00 |

**1044**

ors.[10] On the other hand, the breach of fiduciary duty claims were based upon Baucum's breach of the higher duty to act solely in the interests of the Plaintiffs, by virtue of the position of power and trust he had engendered as their counselor. More specifically, this claim was based upon his disclosure of confidential information, not solely on the sexual relationship which developed during the counseling relationship. These differences are also evidenced by the specific jury instructions on each claim. The charge was divided into sections, isolating each cause of action and instructing the jury as to its elements and the Defendant's respective duties. It is evident in this case that the jury's deliberations were directed to two different torts, each of which supports an award of punitive damages.

■■■■■ Moreover, as Plaintiffs correctly point out in their Motion to Conform the Final Judgment to the Jury Verdict, there is no Texas law which prohibits a jury from awarding punitive damages separately for each proven tort. *See* Tex.Civ.Prac. & Rem. Code Ann. § 41.001 *et seq.* (Vernon Supp. 1994). Unlike compensatory damages, which are limited by the principle of one recovery per injury, punitive damages are guided by the twin goals of punishment and deterrence. *Moriel,* 879 S.W.2d at 16. As further support for this proposition, Plaintiffs point out that the Fifth Circuit sanctions the practice of permitting a jury to award separate punitive damage awards for each proven claim. *See* Fifth Circuit Pattern Jury Instructions, Civil Cases (1995 Ed.) § 15.14. This Section provides:

> You must not award compensatory damages more than once for the same injury. For example, if the plaintiff prevails on two claims and establishes a dollar amount for his injuries, you must not award him any additional compensatory damages on each claim. The plaintiff is only entitled to

be made whole once, and may not recover more than he has lost. Of course, if different injuries are attributed to the separate claims, then you must compensate the plaintiff fully for all of his injuries.

> *With respect to punitive damages, you may make separate awards on each claim that plaintiff has established.* (emphasis added).

In this case, the jury was instructed to do exactly that: the charge informed the jury that "for each claim which you have found, by a preponderance of the evidence, that Defendant is liable for gross negligence, you may also award punitive damages." (Court's Charge to the Jury at 28). The interrogatories asked the jury to determine, for each claim, whether gross negligence had been proven. (Id. at 15, 21). The jury then proceeded to award each Plaintiff $42,500.00 in punitive damages for the professional malpractice claim and $42,500.00 in punitive damages for the breach of fiduciary duty claim. (Id. at 29).

■■■ Absent a showing that a punitive damages award unreasonably "exceeds an amount that will accomplish society's goals of punishment and deterrence," or is somehow violative of due process, the Court should respect the jury's imposition of damages. *See Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *McKinnon v. City of Berwyn,* 750 F.2d 1383 (7th Cir.1984) ("Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury"). In this instance, where it is obvious that the punitive damages award is not excessive, and the punitive damages are reasonably proportioned to the actual damages,[11] the Court should make every effort to abide by the intent of the jury. As Plaintiffs observe, the jury's award reached increments of only $500.00, suggesting that they split the

---

**10.** In addition to initiating a sexual relationship with Plaintiffs, the testimony at trial also established that Baucum breached the applicable standards of care under the tort of professional malpractice in several other ways, including (1) failure to refer Plaintiffs to another counselor, (2) expressions of love and affection toward them,

(3) failure to redirect attention back to counseling when they expressed love and affection toward him, and (4) threats.

**11.** See discussion in Section II B above.

amount of damages which they would have awarded in the aggregate. This, coupled with the structure of the charge, which informed the jury that may award a separate amount of punitive damages for each claim, suggests that the jury intended for each Plaintiff to recover $85,000.00 in punitive damages.

As there is no other reason for the Court to alter the punitive damages awarded by the jury, given the clear reasonableness of the award, the Court finds that each Plaintiff is entitled to recover $85,000.00 in punitive damages. Therefore, Plaintiffs' Motion is GRANTED and the Court will enter an Amended Judgment to reflect these damages. Each Plaintiff shall recover a total of $115,000.00 in damages from Defendant Baucum, representing the $30,000.00 in compensatory damages and $85,000.00 in punitive damages awarded by the jury.

### IV

### Motion to Amend Final Judgment

█ Defendant Casa View Baptist Church now asks the Court to reconsider its decision to tax all court costs against Baucum and amend the Judgment so that the Church can recover its costs of court from Plaintiffs. The Church suggests that it is entitled to such relief because the Court previously awarded summary judgment in its favor on all of Plaintiffs' claims. *Sanders*, 898 F.Supp. 1169. Plaintiffs object to this motion on the ground that the Church engaged in excessive and expensive discovery, noticing and taking numerous depositions which were not "referred to or otherwise utilized in the Summary Judgment proceedings." Plaintiffs also suggest that the issues in this case are so intertwined that it would be virtually impossible to segregate which costs are attributable to Plaintiffs' claims and which are the consequence of Baucum's cross-claims.

In ruling on the Church's motion, the Court is guided by Federal Rule 54 which provides that "costs other than Attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." FED.R.CIV.P. 54(d)(1). The specific issue of prevailing party status was addressed in *Sheets v. Yamaha Motors Corp.*, 891 F.2d 533, 539 (5th Cir.1990), in which the court noted that the issue of costs is in the discretion of the trial court, but that "as prevailing parties, defendants enjoy a strong presumption that they will be awarded costs." Although none of Plaintiffs' claims, as counsel for the Church suggests, were "meritless on their face," it is clear that the Church prevailed on each of the claims against it, including Plaintiffs' claims and Baucum's cross-claims. *Sanders*, 898 F.Supp. at 1182–83.

The Court finds, therefore, that Casa View Baptist Church is entitled to collect costs from Plaintiffs, but only to the extent that such costs can be *directly attributed* to Plaintiffs' claims against the Church; the Church is left to recover the remainder of its costs, which resulted from Baucum's cross-claims for breach of contract and wrongful termination, from Baucum.[12] The Court will enter an Amended Judgment to that effect.

### V

### Conclusion

Having considered each of the post-judgment motions, and the applicable case law, the Court finds that:

Defendant's Motion for Judgment as a Matter of Law is DENIED,

Defendant's Motion for a New Trial is DENIED,

Plaintiffs' Motion to Conform the Judgment to the Verdict is GRANTED, and

---

12. In response to Plaintiffs' concerns about the breadth of the Church's discovery, the Court notes that its decision today merely addresses the Church's right to recover costs from Plaintiffs; it obviously does not speak to the amount of costs to which the Church may be entitled. In submit-

ting its Bill of Costs, the Church must obviously conform to the strictures of 28 U.S.C. § 1920, and in reviewing the Bill of Costs, the Court also will abide by the relevant statutory framework and case law in determining to what extent the Church's costs are recoverable.

Casa View Baptist Church's Motion to Alter the Judgment is GRANTED.

**So Ordered.**